UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN HART and TIFFANY GUZMAN,

     Plaintiffs,

v.

    Case No. 1:20-cv-899

    HON. JANE M. BECKERING

CITY OF GRAND RAPIDS, et al.,

     Defendants.

_____/

## OPINION AND ORDER

Plaintiffs filed this § 1983 action against the City of Grand Rapids ("the City") and three Grand Rapids Police Department (GRPD) officers, alleging federal claims under this Court's federal-question jurisdiction and state-law claims under this Court's supplemental jurisdiction. Plaintiffs' claims arise from their two encounters with GRPD officers on the evening of May 30, 2020 in downtown Grand Rapids, Michigan, encounters that were captured on several videos. Defendants moved for summary judgment (ECF Nos. 111 & 112), and, for the following reasons, the Court grants the motions as to the federal claims and denies the motions as to the state-law claims, which are dismissed without prejudice.

### I.     BACKGROUND

#### A.    Factual Background

***The Protest.***  The Special Response Team (SRT) is a full-time unit of the GRPD that responds to high-risk tactical situations, including barricaded gunmen, hostage situations, search

warrants, and civil unrest (JSMF[1] ¶ 7).  GRPD Sergeant Brad Bush and GRPD Officers Benjamin Johnson and Phillip Reinink, the three individual Defendants in this case, were members of the SRT on Saturday, May 30, 2020 (*id.* ¶¶ 8–9).

On that date, a "Justice for George Floyd" protest was scheduled in downtown Grand Rapids (Police Incident Report, Jt. Ex. A [ECF No. 109-1] at 4; Payne Dep., Jt. Ex. Y [ECF No. 109-19] at 18.  The SRT was activated to be on standby due to recent spikes in violence during similar protests across the country (Police Incident Report, Jt. Ex. A at 4 & 11; Payne Dep., Jt. Ex. Y at 17–18).  Sergeant Johnson indicated that because of the "anti-police climate" across the country, the GRPD was "prepared for the worst" (Police Incident Report, Jt. Ex. A at 11).

In pertinent part, the SRT prepared for the event by organizing "crowd control" packs containing specialty munitions they might need based on available information (Ungrey Dep., Jt. Ex. R [ECF No. 109-12] at 26–27; Garrett Dep., Jt. Ex. T [ECF No. 109-14] at 13–23).  GRPD Officer Joseph Garrett II, an SRT member and munitions instructor, related that when he organized the packets, he kept the "Muzzle Blasts," which are designed to be used directly on an individual at close range, separate from the "Spede Heat" munitions, which are aerial crowd control devices meant to be shot from a long distance (Garrett Dep., Jt. Ex. T at 7–10, 13–14, 71–72).  Both Muzzle Blasts and Spede Heat contain the chemical agent orthochlorobenzalmalononitrile or "CS," a form of tear gas (Reinink Dep., Jt. Ex. O [ECF No. 109-9] at 31; Garrett Dep., Jt. Ex. T at 45; JSMF ¶¶ 15 & 21), although Muzzle Blast delivers the chemical in powder form (Wortz Dep., Jt. Ex. V [ECF No. 109-16] at 8).  Both are deployed from a 40mm launcher (Reinink Dep., Jt. Ex. O at 30; Wortz Dep., Jt. Ex. V at 9).  Spede Heat is delivered with the launcher pointed skyward at a 30- to

---

[1] Unless otherwise noted, and for purposes of resolving only the motions at bar, the Court derives the factual background from the parties' Joint Statement of Material Facts (ECF No. 108).

60-degree angle to the intended target zone up to 150 yards away (JSMF ¶ 21).  Spede Heat is not designed to be directly fired at a person, and, if used incorrectly, can cause significant injury, including death (*id.*).  GRPD Officer Jeremy Wortz testified that, in contrast, "there's no projectile whatsoever" in a Muzzle Blast canister, just the "powder that comes out of the barrel" (Wortz Dep., Jt. Ex. V at 8).  GRPD Lieutenant Matthew Ungrey and several SRT officers indicated that the SRT was trained that the "target area" at which to aim a Muzzle Blast is a person's chest or "center mass" (Reinink Dep., Jt. Ex. O at 30; Johnson Dep., Jt. Ex. P at 27; Ungrey Dep., Jt. Ex. R at 16–17; Wortz Dep., Jt. Ex. V at 9).

Lieutenant Ungrey testified that "all of the 40-millimeter cartridges look very similar" and that the Muzzle Blast and Spede Heat canisters additionally have very similar "markings and whatnot" (Ungrey Dep., Jt. Ex. R at 35).  Officer Garrett testified that the Muzzle Blast canisters and the Spede Heat canisters look "very, very much alike" and could be easily mixed up in the dark (Garrett Dep., Jt. Ex. T at 31).  The parties included the following photograph of the canisters as a joint exhibit:



(Jt. Ex. E [ECF No. 109-5 at PageID.647] at 6).

The protest on May 30, 2020 began peacefully at around 3:00 p.m. (Police Incident Report, Jt. Ex. A at 6).  However, according to the officers and Plaintiffs in this case, downtown Grand Rapids devolved in the evening into a chaotic scene that included—

- unruly and violent rioters throwing bottles and bricks, causing explosions, starting fires, and breaking windows (Police Incident Report, Jt. Ex. A at 4–13);

- sirens, "people breaking windows" and "throwing things" (Hart Dep., Jt. Ex. M [ECF No. 109-7] at 125–133);

- sirens, police cars, fires, fire trucks, destruction, "random people smashing everything—cars and windows" (Guzman Dep., Jt. Ex. N. [ECF No. 109-8] at 58–62);

- rioters throwing "anything that someone could find on the ground" at law enforcement, starting fires and explosions, smashing windows, yelling, swearing, and threatening to kill the police (Reinink Dep., Jt. Ex. O at 169–71);

- rioters assaulting officers with rocks, bricks, cements, pipes, explosives and fireworks; "outrageous things that … [fell] outside of the scope of normal training" (Ungrey Dep., Jt. Ex. R at 22); and

- a level of "destruction" and "violence" that an officer of 12 years indicated he had "never encountered," including "hundreds of rioters throwing various objects from full water bottles, concrete bricks, rocks, glass bottles"; setting fires to police cars; and "causing destruction throughout the downtown area" (Umano Dep., Jt. Ex. U at 44-45).

GRPD Police Chief Eric Payne described the evening as "unprecedented" (Payne Dep., Jt. Ex. Y at 112).  The hours of video footage provided by the parties confirm that downtown, initially the site of a peaceful protest, had become complete mayhem.

GRPD officers established a "Field Force line" across Fulton Street at Sheldon Avenue prohibiting any vehicular or pedestrian traffic heading to the west (JSMF ¶ 12).  Officer Reinink testified that the purpose of the line was to "protect the area surrounding the police department" (Reinink Dep., Jt. Ex. O at 59–60).  The GRPD called all available law enforcement for assistance, including all off-duty GRPD personnel and officers from other agencies including the state police

and neighboring city and county law enforcement (Payne Dep., Jt. Ex. Y at 20–21).

*Unlawful Assembly.* At 9:16 p.m., the GRPD declared an "unlawful assembly," repeatedly issuing an announcement over the public announcement system on its armored vehicle for the crowds to disperse (Dispatch Tr., Jt. Ex. C [ECF No. 109-3] at 574; Dispersal Announcement, Jt. Ex.  D; Bush Dep., Jt. Ex. Q [ECF No. 109-11] at 57–58).  Specifically, the announcements provided the location of escape routes and warned that failure to disperse would subject those assembled to arrest or other police action, including the use of chemical agents or less-than-lethal munitions that may inflict significant pain or result in serious injury (Dispersal Announcement, Jt. Ex.  D).  At 9:41 p.m., police were given the order to don gas masks, and the first deployment of a chemical agent (i.e., tear gas) occurred at 9:48 p.m. (Dispatch Tr., Jt. Ex. C at 572–73).

Officer Garrett testified that the crowd control packets they had prepared were eventually depleted, and officers "were going back into the vault and grabbing special munitions" (Garrett Dep., Jt. Ex. T at 10–12).  Lieutenant Ungrey testified that on more than one occasion, he "sen[t] personnel into headquarters to retrieve as many specialty munition as they could carry up to our staging point" (Ungrey Dep., Jt. Ex. R at 26–27).  Lieutenant Ungrey testified that "we were being overrun" (*id.* at 27).

*First Encounter.* At approximately 11:40 p.m., Plaintiff Sean Hart was driving a Chevy Suburban with Plaintiff Tiffany Guzman in the passenger seat (JSMF ¶ 10).  Plaintiffs were residents of Muir, Ionia County, Michigan (*id.* ¶¶ 1–2).  According to Plaintiff Hart, they had been "fishing" and were previously unaware of the protests and decided to drive around downtown Grand Rapids and "just go see what's going on" before heading home (Hart Dep., Jt. Ex. M at 118–128).  They further testified that they did not hear the orders over the loudspeakers from the

GRPD to disperse (Hart Dep., Jt. Ex. M at 143–44, 156–57, 177; Guzman Dep., Jt. Ex. N at 107–08).

Plaintiff Hart stopped the Suburban at the intersection of Sheldon Avenue and Fulton Street downtown (JSMF ¶ 11).  Testimony from Plaintiffs and the officers, as corroborated by the video footage from several officers' body cameras, indicated that the Suburban lingered in the intersection, and that some in the crowd began gathering at the Suburban, singing along with the song that Plaintiffs played through their amplified speakers and open car windows, a song called "Fuck the Police" (Ort Body Camera Video, Jt. Ex. G at 03:40:33[2]–03:42:03; Wortz Body Camera Video, Jt. Ex. H at 03:40:46–03:42:30; Barnett Body Camera Video, Jt. Ex. I at 03:40:10–03:42:09; Hart Dep., Jt. Ex. M at 135, 194 & 234; Guzman Dep., Jt. Ex. N at 65 & 71; Reinink Dep., Jt. Ex. O at 173; Johnson Dep., Jt. Ex. P [ECF No. 109-10] at 14).  Hart conceded that he "might have put [the song] on deliberately" (Hart Dep., Jt. Ex. M at 135).  Hart remained stopped in the intersection playing his music for close to two minutes before police took any action (Barnett Body Camera Video, Jt. Ex. I at 03:40:24–03:42:08; Lynema Body Camera Video, Jt. Ex J at 03:40:24–03:42:08).

The officers present at the intersection were concerned with the high potential that the Suburban would drive into the Field Force line of officers (Police Incident Report, Jt. Ex. A at 9; Johnson Dep., Jt. Ex. P at 17).  Officers Johnson and Reinink indicated that the Suburban was also blocking their view of the crowd that had assembled that evening in the nearby park (Police Incident Report, Jt. Ex. A at 9; Johnson Dep., Jt. Ex. P at 17).  According to Officer Johnson, Hart

---

[2] The time stamps indicated herein from the Body Camera Videos (ECF Nos. 109-6 & 110-7) reference the time stamp on the upper right corner of the footage.

"placing his vehicle in the position that he did was amping the crowd up, which was causing this to be a much more dangerous situation for all of us" (Johnson Dep., Jt. Ex. P at 17).

GRPD officers in riot gear, including Officer Johnson, came to the open passenger side window of the Suburban where Plaintiff Guzman was sitting (JSMF ¶ 13). The parties do not dispute that Officer Johnson approached the vehicle with his 40mm launcher in the "high ready" position pointed in the direction of the passenger side of the vehicle, i.e., in the direction of Hart and Guzman (*id.* ¶ 14). Officer Johnson testified that his launcher was loaded with a Muzzle Blast CS gas munition (*id.* ¶ 15). Officer Johnson testified that he gave Hart and Guzman "commands to move and to leave in a very … loud voice so that they could hear over the crowd and over their … music" (Johnson Dep., Jt. Ex. P at 17–18). According to Johnson, that was the "extent of their conversation," and Hart "eventually complied" (*id.* at 18). Hart testified that he moved the Suburban forward, then stopped, then moved forward and stopped two more times (Hart Dep., Jt. Ex. M at 199). Video footage reveals that Hart remained in the intersection for another a minute-and-a-half after being ordered to leave (Ort Body Camera Video, Jt. Ex. G at 03:42:07–03:43:43; Lynema Body Camera Video, Jt. Ex, J at 03:42:08–03:43:43). Hart testified that he was "upset they pointed a weapon at the vehicle" and that moving and stopping the car in this manner was "how I expressed it" (Hart Dep., Jt. Ex. M at 199). Hart subsequently drove the Suburban eastbound away from the officer Field Force line (JSMF ¶ 16).

***Second Encounter.*** However, Plaintiff Hart did not head home. Instead, Hart turned around and headed back to the scene, parking approximately 40 to 50 feet or more from the police Field Force line (JSMF ¶ 17). On footage recorded by a civilian bystander, the crowd can be heard shouting, "Yeah, he's coming back!" (Veldman Video, Jt. Ex. L at 18:42). Hart exited the Suburban, leaving his door open, and walked toward the officer line (JSMF ¶ 18). Hart walked

out in front of the crowd (Reinink Dep., Jt. Ex. O at 95).  Sergeant Bush and Officer Reinink both indicated that based on the prior interaction and Hart's return and aggressive manner of approach, they feared that Hart had returned to assault the officers (Police Incident Report, Jt. Ex. A at 9; Use of Force Reports, Jt. Ex. B at 4; Reinink Dep., Jt. Ex. O at 91–92; Bush Dep., Jt. Ex. Q at 51–52).    According to Sergeant Bush, and as corroborated by video footage, the dispersal announcements were "very loud" and were being made throughout Plaintiffs' second encounter downtown with the GRPD (Wortz Body Camera Video, Jt. Ex. H at 3:45:12–03:48:54; Veldman Video, Jt. Ex. L at 18:44–21:40; Bush Dep., Jt. Ex. Q at 57–58).  Additionally, the video footage capturing the second encounter consistently indicates that Plaintiff Hart put his left hand in his pocket as he walked toward the Field Force line of officers, and the crowd can be heard shouting "yeah, get 'em" (Ort Body Camera Video, Jt. Ex. G at 03:45:12–03:45:24; Wortz Body Camera Video, Jt. Ex. H at 3:45:12–03:45:34; Veldman Video, Jt. Ex. L at 18:48–19:03).

Sergeant Bush left the Field Force line and "yelled at [Hart] to get back," twice raising his arm that held a canister of pepper spray and pointing away from the Field Force line (Police Incident Report, Jt. Ex. A at 8; Ort Body Camera Video, Jt. Ex. G at 03:45:20–03:45:24; Wortz Body Camera Video, Jt. Ex. H at 03:45:32–03:45:36; Bush Dep., Jt. Ex. Q at 57–58).  After Sergeant Bush's first gesture to leave, Hart removed his left hand from his pocket and pointed at an officer holding a launcher (Ort Body Camera Video, Jt. Ex. G at 03:45:21; Barnett Body Camera Video, Jt. Ex. I at 03:45:22; Veldman Video, Jt. Ex. L at 19:01; Hart Dep., Jt. Ex. M at 163).  Hart was then only 10 to 15 feet away from the officer Field Force line (Hart Dep., Jt. Ex. M at 165; Reinink Dep., Jt. Ex. O at 95; Bush Dep., Jt. Ex. Q at 36).  Like Sergeant Bush, Officer Reinink testified that he also commanded Hart to "leave" and "get back" (Police Incident Report, Jt. Ex. A

at 3; Reinink Dep., Jt. Ex. O at 95–99). Hart acknowledged that an officer "could have" been asking him to leave (Hart Dep., Jt. Ex. M at 164).

Nonetheless, Hart "continued advancing" (Bush Dep., Jt. Ex. Q at 57–58). Sergeant Bush sprayed Hart with oleoresin capsicum (OC), i.e., pepper spray (JSMF ¶ 19). Sergeant Bush indicated that he was 8 to 10 feet away from Hart when he sprayed a 2 to 3 second burst of pepper spray from his canister at Hart's head (Bush Dep., Jt. Ex. Q at 39). Video footage captured by a bystander confirms that when the pepper spray first hit Hart, he turned around, facing away from the direction of the police and instead facing the crowd (Veldman Video, Jt. Ex. L at 19:05–19:06). The video clips capturing this moment all consistently indicate that Hart lifted his head and took a drag on the cigarette he was holding in his right hand, then turned back toward the police line (Barnett Body Camera Video, Jt. Ex. I at 03:45:29–03:45:31; Lynema Body Camera Video, Jt. Ex. J at 03:45:26–3:45:30; Veldman Video, Jt. Ex. L at 19:06–19:09). Hart himself testified that he "turned back" because he was "mad" (Hart Dep., Jt. Ex. M at 256). He indicated that he "turned … like to see what else" (*id.* at 166).[3]

Officer Reinink testified that he saw Hart "turn away from [the officers]" and then "turn[] back into us again" in an "aggressive manner," which Reinink opined was "unusual behavior for being pepper-sprayed" (Reinink Dep., Jt. Ex. O at 103–04). Officer Reinink testified that he decided to launch a "Muzzle Blast … to try to change that behavior and get him to leave" (*id.* at 104). Officer Reinink testified that using a Muzzle Blast after pepper spray is an "option" that the officers are taught in training (*id.* at 104–07 & 110), a statement that Officer Garrett, the munitions instructor, corroborated (Garrett Dep., Jt. Ex. T at 55–56). Contrary to GRPD training, however,

---

[3] In an interview with Wood TV8, Hart indicated that as he took a hit on his cigarette, he was "thinking about doing something that probably would have ended bad," and then he turned around to face the police again (Jt. Ex. I, at 1:15–1:25).

Officer Reinink did not have anyone witness him load the munition into his 40mm launcher (JSMF ¶ 22). Video footage indicates that with his arms holding the launcher level and pointed at Hart's chest, Officer Reinink launched a munition at Hart (Veldman Video, Jt. Ex. L at 19:09–19:10).

Officer Reinink's 44mm launcher did not contain a Muzzle Blast. Instead, it contained a Spede Heat munition, which he launched a few feet away from Hart, striking Hart in the left shoulder area (JSMF ¶ 20). The munition appears to career off the left shoulder of Hart, who remained on his feet (Wortz Body Camera Video, Jt. Ex. H at 03:45:41–03:45:47; Lynema Body Camera Video, Jt. Ex. J at 03:45:31–03:45:32; Veldman Video, Jt. Ex. L, 19:09–19:11). Consistent with the officers' recollections and their body camera footage, Plaintiff testified that after being struck, he turned around, flicked his cigarette at the officers, "flipped them off" and walked back to the Suburban (Police Incident Report, Jt. Ex. A at 4; Ort Body Camera Video, Jt. Ex. G at 03:45:34–03:46:05; Wortz Body Camera Video, Jt. Ex. H at 03:45:43–03:45:47; Lynema Body Camera Video, Jt. Ex. J at 03:45:32–03:45:38; Veldman Video, Jt. Ex. L at 19:10–19:14; Hart Dep., Jt. Ex. M at 166–67; Guzman Dep., Jt. Ex. N at 81).

Hart still did not leave the scene. Hart concedes that he drove the Suburban forward toward the officers, stopped, backed up a few feet, and "revved" his engine (Police Incident Report, Jt. Ex. A at 9; Use of Force Reports, Jt. Ex. B at 4; Wortz Body Camera Video, Jt. Ex. H at 03:46:21–3:48:55; Veldman Video, Jt. Ex. L at 19:49–20:15; Hart Dep., Jt. Ex. M at 158–60 & 168; Johnson Dep., Jt. Ex. P at 32). Additionally, someone in the crowd audibly shouted "Kill cops!" (Wortz Body Camera Video, Jt. Ex. H at 03:46:35; Lynema Body Camera Video, Jt. Ex. J at 03:46:23; Veldman Video, Jt. Ex. L at 20:04). Other encouragements from the crowd included, "get em!" "massacre the police," and "only good cop is a dead cop!" (Veldman Video, Jt. Ex. L at 19:57–20:00). Hart further concedes, and video footage captures, that each time he revved his engine,

the crowd cheered him on (Police Incident Report, Jt. Ex. A at 9; Use of Force Reports, Jt. Ex. B at 4; Ort Body Camera Video, Jt. Ex. G at 03:45:59; Wortz Body Camera Video, Jt. Ex. H at 3:46:41–3:46:52 & 3:47:23–3:47:26; Veldman Video, Jt. Ex. L at 20:13–20:23; Hart Dep., Jt. Ex. M at 159–60).

Plaintiff Guzman testified that she told Hart "don't do it," because she feared Hart was thinking about addressing the police line again (Guzman Dep., Jt. Ex. N at 100–01). Hart testified that Guzman "might" have told him that, and Hart conceded that he was, in fact, thinking about "getting back out" (Hart Dep., Jt. Ex. M at 169–70). Sergeant Bush and Officer Reinink unholstered their firearms in fear that Hart might attempt to drive his vehicle into the officer line (Police Incident Report, Jt. Ex. A at 9; Use of Force Report, Jt. Ex. B at 4). `

Eventually, as a rioter climbed down from the Suburban's roof, Hart left the scene and drove southbound on Sheldon Avenue, "flipping off" the officers through the sunroof as he drove away (Police Incident Report, Jt. Ex. A at 9; Veldman Video, Jt. Ex. L at 21:02–21:37; Hart Dep., Jt. Ex. M at 169). Guzman testified that she asked Hart if he wanted her to drive them home, but Hart indicated that he was "fine to drive" (Guzman Dep., Jt. Ex. N at 82).

On Monday, June 1, 2020, Plaintiff Hart went to the emergency room for left shoulder pain as well as eye irritation from the pepper spray (Hart Dep., Jt. Ex. M at 174–76; Guzman Dep., Jt. Ex. N at 83–84). Hart testified that he had bruising and a small abrasion on his left shoulder that was photographed (Hart Dep., Jt. Ex. M at 89–92). The parties included the following joint photograph of his shoulder:



(Jt. Ex. HH [ECF No. 110-8]; *see also* Jt. Ex. E [ECF No. 109-5]).  Hart experienced no permanent

physical injuries (Hart Dep., Jt. Ex. M at 95).  Plaintiff Guzman had no physical injuries resulting

from the incident (Guzman Dep., Jt. Ex. N at 41).

The GRPD subsequently took disciplinary action against Officer Reinink arising out of the

incident (JSMF ¶ 23).  Officer Reinink indicated that because Hart "didn't appear to be injured"

and walked away from the officers back to the Suburban, Reinink did not even know that he had

mistakenly used a Spede Heat until a day or two after the riot (Reinink Dep., Jt. Ex. O at 112–13).

Reinink indicated that because the evening was so "chaotic," he was "carrying different types of

munitions" and "mistakenly had the wrong round in [his] 40mm launcher" (Police Incident Report,

Jt. Ex. A at 4, 10).  Officer Reinink conceded that he should have used a Muzzle Blast (Reinink

Dep., Jt. Ex. O at 110–12).  Reinink was placed on 20 hours of unpaid leave and required to be

retrained and recertified on chemical and less-than-lethal munitions (Reinink Dep., Jt. Ex. O at

17–20; Payne Dep., Jt. Ex. Y at 123–24).  The GRPD did not take any action against Sergeant

Bush or Officer Johnson arising out of the incident (JSMF ¶ 23).

**B.      Procedural Posture**

A few months later, Plaintiffs initiated this action on September 16, 2020.  In their Second Amended Complaint filed on March 22, 2021, which is the operative pleading, Plaintiffs allege the following three counts:

I.      Federal Law Claims—Excessive Force Pursuant to 42 U.S.C. § 1983 and/or 4th or 14th Amendments to the United States Constitution—Reinink, Bush and Johnson;

II.     Federal Law Claim—Failure to Train, Inadequate Policies and/or Procedures, Illegal Custom and/or Practices—City; and

III.    State Law Claims—Gross Negligence, Willful and Wanton Misconduct, Assault and/or Battery— Reinink, Bush and Johnson

(*id.*).  Defendants filed their respective Answers (ECF Nos. 50–51).

On April 22, 2022, following completion of discovery, the City, Sergeant Bush, and Officer Johnson filed their motion for summary judgment (ECF No. 111), and Defendant Reinink filed his motion for summary judgment (ECF No. 112).  Plaintiffs filed their respective responses in opposition on May 20, 2022 (ECF Nos. 118 & 119).  On May 27, 2022, Defendants filed their respective replies (ECF Nos. 120 & 121).  The parties collaborated on a joint statement of undisputed facts (ECF No. 108) and a joint exhibit book (ECF Nos. 109 & 110), including nine clips of video footage (ECF Nos. 109-6, 110-5 & 110-7).  The video footage consists of body camera video footage from five GRPD officers, the video footage captured by a bystander, video footage from a local news report, and video footage of the GRPD's press conference on July 28, 2020.  Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.    ANALYSIS

### A.    Motion Standard

A party may move for summary judgment under Federal Rule of Civil Procedure 56, identifying each claim on which summary judgment is sought. FED. R. CIV. P. 56(a).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  In resolving a motion for summary judgment, a court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs.*, *Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010).  The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The function of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249).

"A dispute is genuine only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) (citation omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

14

not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Record evidence that can displace the nonmovant's version of the facts includes both videos and photographs. *Brax v. City of Grand Rapids, Mich.*, 742 F. App'x 952, 956 (6th Cir. 2018) (citations omitted).  *See, e.g., Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017) (indicating that its decision to affirm the district court's award of summary judgment was "largely driven by the available video evidence, which documents most of the relevant events from a helpful angle").

### B.    Plaintiffs' Federal Claims

The Court turns first to examining Plaintiffs' claims in Counts I and II, which are brought under 42 U.S.C. § 1983, as these claims form the basis of this Court's exercise of original jurisdiction under 28 U.S.C. § 1331 (Federal Question).  Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States Constitution. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1160 (6th Cir. 2021).  To bring a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (citation omitted).  A court's threshold inquiry under § 1983 is always to identify the specific constitutional right at issue. *Dibrell, supra.*  Once the right is identified, the court must then consider the statutory "elements of, and rules associated with, an action seeking damages for its violation" under § 1983. *Id.*

1.    **Count I:  Plaintiffs' § 1983 Claims against the Individual Defendants**

In Count I, which Plaintiffs title "Federal Law Claims—Excessive Force Pursuant to 42 U.S.C. § 1983 and/or 4th or 14th Amendments to the United States Constitution—Reinink, Bush and Johnson," Plaintiffs allege three instances of excessive force by the individual officers:  (1) Officer Johnson "pointing a loaded weapon at them"; (2) Sergeant Bush using "mace spray on [Plaintiff] Sean [Hart]"; and (3) Officer Reinink "shooting a long-range projectile directly at and hitting [Plaintiff] Sean [Hart]" (2d Amend. Compl. ¶ 38).

a.    *General Legal Principles Governing Excessive Force Claims under the Fourth Amendment*

The parties analyze Plaintiffs' excessive force claims under the Fourth Amendment.  *See* Defs. Briefs, ECF No. 111-1 at PageID.1352 and ECF No. 113 at PageID.1393 n.2; Pls. Resps., ECF No. 118 at PageID.1424 and ECF No. 119 at PageID.1461, 1477.  The constitutional right to be free from the use of excessive force by law enforcement officers flows from the Fourth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment.  *Graham v. O'Connor*, 490 U.S. 386, 388, 395 (1989); *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017).  "An excessive force inquiry turns on 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 397 (internal quotation marks omitted)).  "Analyzing whether force was excessive involves balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019) (quoting *Muehler v. Mena*, 544 U.S. 93, 108 (2005) (quoting *Graham*, 490 U.S. at 396)).

"Factors used to gauge whether there has been excessive force include 'the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [an arrestee] is actively resisting arrest or attempting to evade arrest by flight.'" *Stricker, supra* (quoting *Graham*, 490 U.S. at 396). The Fourth Amendment's reasonableness test is not capable of "mechanical application," and these three factors are not exhaustive. *Id.* at 396. "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and making "'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation[.]'" *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (quoting *Graham*, 490 U.S. at 396–97). Hence, where video footage of an incident exists, as here, a district court would commit reversible error in relying upon "screen shots" from the footage to decide the reasonableness of the officers' use of force, because the officers' perspective "did not include leisurely stop-action viewing of the real-time situation that they encountered." *Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 767 (6th Cir. 2021).

The reasonableness standard does not consider "whether it was reasonable for the officer 'to create the circumstances,'" and "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citation omitted). Moreover, "the definition of reasonable force is partially dependent on the demeanor of the suspect." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (internal quotation marks omitted). Hence, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009). "In the excessive-force context, the focus is on the extent of the force used rather than

the extent of the injuries, although the two are at least imperfectly correlated." *Roberts v. Coffee Cnty., Tennessee*, 826 F. App'x 549, 556 (6th Cir. 2020) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (per curiam)).

"At the summary judgment stage, … once [a court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, … the reasonableness of [the defendant's] actions … is a pure question of law." *Scott*, 550 U.S. at 381 n.8 (2007). *See Zuress v. City of Newark, Ohio*, 815 F. App'x 1, 8 (6th Cir. 2020) (relying on the proposition of law from *Scott*, 550 U.S. at 381 n.8); *Pelton v. Perdue*, 731 F. App'x 418, 422 (6th Cir. 2018) (same); *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (same); *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (same). In *Scott,* for example, given the video evidence and lack of dispute about the material facts, the United States Supreme Court decided to "slosh [its] way through the factbound morass of 'reasonableness'" and ultimately concluded that it had "little difficulty" deciding that it was reasonable for the officer to take the action that he did. 550 U.S. at 383–84.

Last, "[e]ach defendant's liability must be assessed individually based on his own actions." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015). A plaintiff must demonstrate that "each defendant, through that defendant's own actions, 'subject[ed]' him (or 'cause[d]' him to be subjected) to the constitutional deprivation." *Rudd v. City of Norton Shores, Mich.*, 977 F.3d 503, 512 (6th Cir. 2020) (citation omitted).

    **b.**    *Qualified Immunity Defense, in General*

It is undisputed that the individual officers in this case were government officials acting under the color of state law and in the course and scope of their employment (JSMF ¶¶ 3–5).[4] "The doctrine of qualified immunity shields 'government officials performing discretionary functions' from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Puskas v. Delaware Cnty., Ohio*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Harlow*, 457 U.S. at 818). *See also Shumate v. City of Adrian, Mich.*, 44 F.4th 427, 439 (6th Cir. 2022) (holding that the ability to go forward on a § 1983 claim against an individual government official is "limited by the qualified immunity exception") (quoting *Ahlers v. Schebil*, 188 F.3d 365, 372–73 (6th Cir. 1999)). The doctrine "affords officers 'breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Abdur-Rahim v. City of Columbus, Ohio*, 825 F. App'x 284, 286 (6th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quotation marks and citation omitted)).

"[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Puskas, supra* (quoting *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)). "Once invoked, the plaintiff must show that the defendant is *not* entitled to qualified immunity." *Id.* (emphasis in original). Both prongs must be met "for the case to go to a factfinder to decide if [the] officer's

---

[4] Plaintiffs sued the officers in both their individual and official capacities. Plaintiffs' official-capacity claims, however, are "only another way of pleading an action against the entity of which the officer is an agent." *Graham*, 473 U.S. at 165–66. The official capacity claims are therefore duplicative of Plaintiffs' municipal liability claim in Count II.

conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights.  If either one is not satisfied, qualified immunity will shield the officer from civil damages." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 236).  "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity."  *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citing *Pearson*, 555 U.S. at 236).

Regarding the second prong, the right at issue must have been "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 232).  The "relevant, dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Binay v. Bettendorf*, 601 F.3d 640, 652 (6th Cir. 2010) (quoting *Saucier*, 533 U.S. at 202).  "[C]learly established law" should not be defined "at a high level of generality."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (citations omitted). Such an abstract framing "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  Rather, the precedent must be "particularized" to the facts of the case.  *White, supra* (citation omitted).  There does not need to be a case directly on point, but "existing precedent must have placed the … constitutional question beyond debate."  *Id.* (citation omitted).  *Cf. Abdur-Rahim*, 825 F. App'x at 288 (indicating that the Sixth Circuit generally disregards out-of-circuit cases as "clearly established law" because "we can't expect officers to keep track of persuasive authority from every one of our sister circuits") (quoting *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020)).

The United States Supreme Court has instructed that "[s]pecificity proves especially important in the excessive force context, an 'area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Abdur-Rahim*, 825 F. App'x at 286 (quoting *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1153 (2018)). "In the excessive-force context, the law is 'clearly established' only if the plaintiff 'identif[ies] a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Evans v. Plummer*, 687 F. App'x 434, 440 (6th Cir. 2017) (citation omitted).

"When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)).

### c.    *Individual Officers*

#### (1)    Officer Johnson

In support of summary judgment in his favor based on qualified immunity, Officer Johnson first argues that his actions did not violate clearly established law particularized to the facts of this case (ECF No. 111-1 at PageID.1354).  Indeed, Officer Johnson contends that Plaintiffs "cannot cite a case which would have put officers on notice that it was unconstitutional to point a less-than-lethal force option at a vehicle and its occupants that remained in the middle of a riot in a manner that increased the already dangerous situation facing the officers" (*id.*).  Officer Johnson argues that he is also entitled to summary judgment on the merits of Plaintiffs' claim against him because he acted reasonably in holding a less-than-lethal force option at the "high ready" where his "action was a low level of force in response to Plaintiffs' behavior in remaining in the area, blocking traffic and the officers' view of the crowd, and drawing the unruly crowd back toward the field force

perimeter line, increasing the danger to the officers and others in the area" (*id.* at PageID.1353, 1356–1357).

In response, Plaintiffs argue that Officer Johnson improperly invites this Court to view the evidence in his favor rather than in the light most favorable to them (ECF No. 119 at PageID.1470– 1471).  Plaintiffs contend that this Court must believe that Plaintiffs were "simple motorists not connected to the protests that night who found themselves being targeted with force for reasons they did not understand" (*id.* at PageID.1472).  Plaintiffs argue that a reasonable finder of fact could certainly conclude that Officer Johnson utilized excessive and unreasonable force in pointing a weapon at Plaintiffs "despite neither [Plaintiff] being armed, committing a crime or posing a threat" (*id.* at PageID.1473–1474).  Plaintiffs point out that Guzman believed Officer Johnson was "going to kill her" (*id.* at PageID.1473).  Regarding Officer Johnson's assertion of qualified immunity, Plaintiffs briefly indicate that they have "yet to see any precedent that permits an officer to point a weapon at an individual that the officer admits did 'nothing'" (*id.* at PageID.1477).

Because Officer Johnson has invoked a qualified immunity defense, this Court's threshold inquiry is whether the defense limits Plaintiffs from going forward on their § 1983 excessive force claim against him.  "Qualified immunity is intended not only to protect officials from civil damages, but just as importantly, to protect them from the rigors of litigation itself[.]"  *Everson v. Leis*, 556 F.3d 484, 491 (6th Cir. 2009).  Plaintiffs bear the burden of showing that (1) Officer Johnson violated a constitutionally protected right and (2) the right was clearly established at the time the act was committed.  As the United States Supreme Court and the Sixth Circuit have held, it is not mandatory to address the two qualified immunity prongs sequentially; rather, discussion of only one prong will in some cases result "in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."  *Tlapanco v. Elges*, 969 F.3d

638, 656–57 (6th Cir. 2020) (quoting *Pearson*, 555 U.S. at 236–37).  In assessing this claim against Officer Johnson, the Court finds the clearly-established prong is dispositive and entitles him to summary judgment on Plaintiffs' excessive force claim against him in Count I.

The Sixth Circuit has held that pointing a *firearm* at an individual may, in some particularized circumstances, constitute excessive force.  *See, e.g., Wright*, 962 F.3d at 866; *Vanderhoef*, 938 F.3d at 277–78.  However, as Officer Johnson points out in reply (ECF No. 120 at PageID.1498), the mere fact that Plaintiff Guzman *thought* she saw a firearm does not make the law on pointing firearms applicable to the less-than-lethal option that Officer Johnson possessed. There is no dispute that the device Officer Johnson held was a 40mm launcher loaded with a Muzzle Blast CS gas munition.

Plaintiffs have wholly failed to identify *any* precedent "particularized" to the facts of this case, i.e., precedent that places the constitutional question "beyond debate."  *See* Pls.' Resp., ECF No. 119 at PageID.1477 ("Plaintiff has yet to see any precedent that permits an officer to point a weapon at an individual that the officer admits did 'nothing' that showed she was a threat, as Johnson did at pp 16–17 of his deposition.").  Hence, Plaintiffs have simply not made the showing necessary to demonstrate that Officer Johnson is not shielded by the doctrine of qualified immunity.  As the Sixth Circuit has previously found, the qualified immunity question can properly "begin with, and could end with, the reality that [the plaintiff] points to no Supreme Court or Sixth Circuit case" that constitutes clearly established precedent.  *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993 (6th Cir. 2017).

Indeed, Officer Johnson points out that the Sixth Circuit has addressed the topic in only two cases—*Stricker* and *Evans*, within the context of pointing a taser—and has not yet held that pointing a less-than-lethal munition constitutes excessive force in violation of the Fourth

Amendment.  "[W]hen the facts confronting an officer leave ambiguity about whether the officer's actions violate a constitutional right, the officer is entitled to qualified immunity."  *Meadows v. City of Walker*, 46 F.4th 416, 423–24 (6th Cir. 2022).

First, in *Stricker*, 710 F.3d at 364, a 2013 decision, the plaintiff called 911 and requested medical assistance for her son, who was incoherent and losing consciousness after a drug overdose. However, the plaintiff subsequently refused to allow police officers into the family home to check on her son, and the officers eventually forced entry to do so.  *Id.* at 354–56.  By that point, the plaintiff was in her locked bedroom.  *Id.* at 356.  An officer kicked in the door, "pointed a taser gun" at the plaintiff, "put a forceful pressure hold" on her to "force her to stand," checked her for weapons, and "roughly handcuffed her."  *Id.* (internal citations omitted).  The Sixth Circuit found no constitutional violation, explaining that the officer's actions were objectively reasonable because the plaintiff admitted "repeatedly disobey[ing] lawful officer commands," had "attempt[ed] to prevent medical personnel's access" to her son, and had "attempt[ed] to evade arrest by flight" by hiding in the bedroom.  *Id.* at 364–65.

Second, in *Evans v. Plummer*, 687 F. App'x at 442, a 2017 case, the plaintiff claimed that the defendant used excessive force when he "threatened to tase her, then twice pointed his taser at her."  The district court concluded that the defendant was not entitled to qualified immunity because "[a] jury could reasonably conclude that [the defendant] intended to maliciously inflict gratuitous fear when he aimed his [t]aser directly at Evans' head."  *Id.*  On appeal, the defendant argued that the relevant law was not clearly established, and the Sixth Circuit agreed.  *Id.*  Noting that *Stricker* was the only time that it had even addressed this scenario, the Sixth Circuit indicated that "our court has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force."  *Id.* (footnote omitted).  Because it was not apparent from

pre-existing caselaw that pointing a taser at the plaintiff violated the Fourth Amendment, the Sixth Circuit reversed the district court's denial of qualified immunity to the defendant. *Id.* at 444.

The absence of any existing precedent on this issue is dispositive of Plaintiffs' excessive force claim against Officer Johnson.  Absent any precedent providing notice to the contrary, a reasonable officer in Officer Johnson's position during the unlawful assembly on May 30, 2020 would not have known that he was committing a constitutional violation when he approached Hart's Suburban with a less-than-lethal force option in the "high ready" position pointed in Plaintiffs' direction.  Because Plaintiffs have not shown that Officer Johnson violated a clearly established right, qualified immunity shields Officer Johnson from liability on Plaintiffs' excessive force claim, and the Court grants him summary judgment on this basis.

### (2) Sergeant Bush

Next, turning to Plaintiff Hart's claim against Sergeant Bush, Sergeant Bush argues that he is also entitled to qualified immunity where he could not have been on notice that it constitutes excessive force to directly pepper spray a lingering individual blocking an intersection after crowd dispersal orders and warnings have been issued (ECF No. 111-1 at PageID.1358).  Alternatively, Sergeant Bush argues that he is entitled to summary judgment on the merits of Plaintiff Hart's claim because his actions were reasonable where Hart "came back to the scene of the riot, after being specifically directed by officers to leave" and after seeing the officers use chemical munitions like pepper spray on the crowd gathering around Hart's car during the first encounter (*id.* at PageID.1359–1360).

In response, Plaintiffs argue that a reasonable finder of fact could conclude that Sergeant Bush utilized excessive force when he sprayed Plaintiff Hart in the face with a chemical agent from close range (ECF No. 119 at PageID.1474).  Plaintiffs argue that even though this case

involves a riot, the factors in *Graham* are still properly applied (*id.* at PageID.1475–1476). Plaintiff Hart only briefly addresses Sergeant Bush's assertion of qualified immunity, citing two cases in support of his contention that Hart had a "clearly established right to not be sprayed at close range with a chemical agent" (*id.* at PageID.1477).

Like Officer Johnson, Sergeant Bush invokes a qualified immunity defense, and Plaintiff Hart bears the burden of showing that Sergeant Bush is not entitled to this defense.  In assessing the claim against Sergeant Bush, the Court again finds the clearly-established prong dispositive and entitles Sergeant Bush to summary judgment.

Plaintiff Hart identifies two cases in support of his burden under the clearly-established prong (ECF No. 119 at PageID.1477).  Neither case satisfies the requisite showing.  The first case Hart identifies is *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006).  According to Hart, "it was well-established by *Ciminillo* well before 2020 that Bush was not permitted to use any force against a non-aggressor like Hart simply because he was present at an alleged riot scene" (*id.*). *Ciminillo* involved an officer shooting a plaintiff "allegedly without provocation and at point blank range, in the chin and chest with a beanbag propellant."  434 F.3d at 463.  Under the plaintiff's version of facts, Ciminillo was walking with his hands above his head in the "surrender" position and "cooperating with police."  *Id.* at 463, 467.

*Ciminillo* does not "squarely govern the specific facts at issue," which, as Plaintiff Hart concedes, are evident in the video evidence in this case (ECF No. 119 at PageID.1474).  *Ciminillo* concerned a use of force (beanbag propellant) different from the force used in this case (pepper spray).  More importantly, *Ciminillo* did not concern any provocation by the plaintiff whereas Hart was undisputedly advancing on a Field Force line of police officers.  In other words, *Ciminillo*

would not have put Sergeant Bush on notice that his action violated the Fourth Amendment.[5]  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know."  *D.C. v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 590 (2018).

The second decision Plaintiff Hart identifies is *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009).  According to the plaintiff's version of facts in *Grawey*, the officer in that case discharged his pepper spray while Grawey "had his hands against the wall, after waiting for the officer to catch up to him, without any indication of resistance."  *Id.* at 311.  Grawey further contended that the officer "continued to spray [him] from close range" and that "Grawey felt an intense burning before collapsing to the sidewalk, unconscious."  *Id.* at 307.  The *Grawey* panel held that based on prior precedent of the Sixth Circuit, "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest."  *Id.* at 311 (citing cases therein).  The *Grawey* panel additionally held that "[e]ven if [the officer's] use of pepper spray *per se* on Grawey was not excessive force, [the officer's] discharging enough pepper spray at a very close distance to cause Grawey to pass out supports a claim of excessive force."  *Id.* at 312.

Plaintiff Hart asserts that "it was established [in] *Grawey* that Plaintiff Hart had a clearly established right not to be sprayed at close range with a chemical agent" (ECF No. 119 at

---

[5] Sergeant Bush also references the Sixth Circuit's crowd-dispersal decision in *Abdur-Rahim v. City of Columbus, Ohio*, 825 F. App'x 284, 287–88 (6th Cir. 2020), where the Sixth Circuit granted qualified immunity to an officer who used pepper spray first to "fog" the crowd then to take a direct shot at the plaintiff, who did not leave the area after forty-five minutes of dispersal orders (ECF No. 111-1 at PageID.1358).  Defendants acknowledge that the Sixth Circuit decided *Abdur-Rahim* in August 2020, i.e., three months after the incident in this case, and the decision therefore could not provide notice to Sergeant Bush for this incident, although the Sixth Circuit's analysis, including its discussion of *Ciminillo*, is consistent with the Court's conclusions herein.

PageID.1477).   The Court disagrees.   Neither holding in *Grawey* "squarely governs" the undisputed facts at bar.  Plaintiff Hart, unlike Grawey, was not merely waiting for an officer to arrive when he was pepper sprayed; rather, it is undisputed that Hart was advancing toward a Field Force line of police during a protest-turned-riot.  Additionally, while the video clips in this case do not allow for a precise determination of the distance between Sergeant Bush and Hart, the record is clear that Sergeant Bush did not spray Hart at "close range," nor did Sergeant Bush spray Hart with enough pepper spray to cause Hart to lose even the ability to walk or drive away, let alone lose consciousness.  In sum, the decision in *Grawey* would not have put Sergeant Bush on notice that his particularized action violated the Fourth Amendment.  Again, unless the precedent is clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply, the rule is not one that every reasonable official would know.  *Wesby, supra.*

In conclusion, Plaintiff Hart has not identified precedent showing that a reasonable officer in Sergeant Bush's position on the evening of May 30, 2020 would have known that he was committing a constitutional violation when he sprayed Hart with a short burst of pepper spray while Hart was advancing toward the Field Force line during a protest-turned-riot.  Because Plaintiff has not shown that Sergeant Bush violated a clearly established right, qualified immunity shields Sergeant Bush from liability on Plaintiff Hart's excessive force claim, and the Court grants Sergeant Bush summary judgment on this basis.

### (3) Officer Reinink

Last, in support of summary judgment in his favor, Officer Reinink argues that he chose to deploy what he believed to be a less-than-lethal Muzzle Blast only after Plaintiff Hart, in the midst of a riot, chose to "return to the scene, further incite the crowd, exit his vehicle and approach the police line, an individual who had defied police commands, aggressively approached the officers

after specifically being ordered to leave, and after an initial deployment of OC spray proved ultimately ineffective at gaining compliance" (ECF No. 113 at PageID.1398–1399).  Reinink points out that Muzzle Blast and Spede Heat are the same size, color and weight, with the difference between the two munitions "not readily discernible from the outside when dealing with a fast-paced situation" (*id.* at PageID.1400).  Reinink asserts that his mistake was objectively reasonable and/or protected by qualified immunity (*id.* at PageID.1398–1400).  According to Officer Reinink, "the only admissible evidence establishes that Reinink made a mistake, one that [a] rational jury would find was reasonable under the circumstances facing him and the other officers during that unprecedented night" (*id.* at PageID.1403).

In response, Plaintiffs assert that it is *not* uncontested that Officer Reinink mistakenly used the munition in question, and Plaintiffs contend that the question of mistake rests on the credibility of Officer Reinink's testimony, which is to be determined by a finder of fact (ECF No. 118 at PageID.1432–1433).  Plaintiffs argue that even if other people on the day in question were committing crimes during the protest, force was not justified against Plaintiffs, who were not committing any crimes, engaging in any threatening conduct, or attempting to resist or evade arrest (*id.* at PageID.1433–1435).  Plaintiffs opine that during moments of civil unrest, the prohibition on excessive force takes on more significance, not less (*id.* at PageID.1435).

Officer Reinink invokes qualified immunity, and Plaintiff Hart therefore bears the burden of satisfying both prongs of the qualified immunity analysis before his claim may go forward, to wit: (1) whether Officer Reinink violated a constitutionally protected right; and (2) if so, whether the right was clearly established at the time the act was committed.  Here, the Court determines that the most efficient approach is to analyze the first prong.

The Supreme Court has held that the doctrine of qualified immunity "affords officers 'breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Abdur-Rahim*, 825 F. App'x at 286 (quoting *Stanton*, 571 U.S. at 6). *See also Chappell*, 585 F.3d at 907 ("Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.") (citing *Pearson*, 555 U.S. at 231).

According to Plaintiff Hart, however, qualified immunity is not available to Officer Reinink because his claimed mistake—launching a Spede-Heat munition rather than a Muzzle Blast—rests exclusively on finding Officer Reinink's testimony credible.  The Court disagrees. As Officer Reinink points out in his reply brief (ECF No. 121 at PageID.1509), his testimony is not the only basis supporting the proposition that a mistake occurred.  Rather, the record also contains testimony from other GRPD officers that the training for discharging Spede Heat required an upward-angled trajectory, launched over a crowd, and from a significant distance away, e.g., "150 yards," whereas the training for discharging a Muzzle Blast required an officer to point the launcher in the direction of the subject's chest from a relatively short distance, e.g., two to five feet (Ungrey Dep., Jt. Ex. R at 16–17 & 30; Garrett Dep., Jt. Ex. T at 9–10; Umanos Dep., Jt. Ex. U at 11–12 & 46).  The record also contains video evidence showing that Officer Reinink discharged the launcher consistent with the training for Muzzle Blast rather than the training for Spede Heat (Veldman Video, Jt. Ex. L at 19:09–19:10; Umanos Dep., Jt. Ex. U at 46).

In contrast, Plaintiff Hart has presented no evidence to contradict Officer Reinink's claimed mistake.  Plaintiff Hart cannot merely announce that a genuine issue of material fact exists.  Rather, as the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts." *Scott*, 550 U.S. at 380 (quoting *Matsushita*, 475 U.S. at 586–87). To withstand a properly supported motion for summary judgment, a plaintiff is obliged to come forward with "specific facts," based on "discovery and disclosure materials on file, and any affidavits," showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott, supra.* Plaintiff Hart has failed to carry this burden by adducing evidence refuting Officer Reinink's account and has concomitantly failed to demonstrate that the claimed mistake is a genuine issue for trial.

Of course, an officer's "good intentions" cannot make "an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397. Conversely, an officer's violation of police department policies does not alone equate to a violation of the Fourth Amendment's objective reasonableness standard. *See Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017); *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992) (holding that the officer's use of force was reasonable, even though the use of force arguably violated police policy). In analyzing excessive force claims brought under § 1983, "the issue is whether the officers violated the Constitution, not whether they should be disciplined by the local police force." *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013) (quoting *Smith*, 954 F.2d at 347). "[T]he Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work." *Coitrone v. Murray*, 642 F. App'x 517, 522 (6th Cir. 2016) (citation omitted). Hence, "[e]ven if an officer acts contrary to her training, ... that does not itself negate qualified immunity where it would otherwise be warranted." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 616 (2015).

Under *Graham,* 490 U.S. at 396–97, this Court must give careful attention to the particular facts and circumstances before it, including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."  Further, this Court must give a "measure of deference to the officer's on-the-spot judgment about the level of force necessary," a measure of deference that "carries great weight when all parties agree that the events in question happened very quickly[.]"  *Brax*, 742 F. App'x at 956 (quoting *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008)).

As Plaintiff Hart indicates, "the undeniable reality of these events" is evident in the video footage (ECF No. 119 at PageID.1474).  In examining the relevant facts at bar, including all inferences in Plaintiff Hart's favor that are supportable by the record, the Court finds that the circumstances that confronted Officer Reinink during the unlawful assembly on May 30, 2020 were archetypal "tense, uncertain, [or] rapid[.]"  *See Graham*, 490 U.S. at 397.

Under the first *Graham* factor, Plaintiff Hart's conduct, which included not only remaining at the scene of an unlawful assembly but also returning to the same scene after being directed to leave, presumably violated more than one state statute but most notably MICH. COMP. LAWS § 750.523 (providing that "[i]f any person … when required by any such magistrate or officer to depart from the place of such riotous or unlawful assembly, shall refuse or neglect so to do, he shall be deemed to be 1 of the rioters or persons unlawfully assembled, and shall be liable to be prosecuted and punished accordingly").  *See also* MICH. COMP. LAWS § 752.542 (Incitement to riot).  While Plaintiff Hart emphasizes that he was not charged with this or any other crime, the pertinent question is the severity of the crime witnessed by an officer in Officer Reinink's position, not whether a prosecutor subsequently decided to bring charges.  *See, e.g., Schliewe v. Toro*, 138

F. App'x 715, 722 (6th Cir. 2005) (indicating that "[w]hile [the plaintiff] was not charged with a serious crime, it was difficult for the officers to judge his intentions," and ultimately holding that "[t]he amount of force used to subdue [the plaintiff] was reasonable").  Again, the reasonableness standard focuses on the particular moment the officer made his decision to use force and the information he had at that time.  *See, e.g., Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).  Here, refusing or neglecting to leave an unlawful assembly is a serious crime, and this first factor weighs in favor of Officer Reinink.

Turning to the second *Graham* factor, the Court concludes that under the relevant facts, including all inferences in Plaintiff's Hart favor that are supportable by the record, a reasonable officer on the scene on the evening of May 30, 2020 would find that Hart posed an immediate threat to the safety of the officers in the Field Force line.  Specifically, the record is undisputed that Hart, despite multiple orders to leave, returned to the scene, exited his car and advanced toward the officers.  Hart undisputedly walked toward the Field Force line of officers with his hand in his pocket.  Hart was undisputedly not deterred by Sergeant Bush's use of pepper spray.  And just before Officer Reinink launched the munition, Hart undisputedly lifted his head, took a drag on his cigarette, and turned back again toward the police line.  The second factor likewise weighs in favor of Officer Reinink.

Regarding the third *Graham* factor, the Sixth Circuit has held that "[a] plaintiff's resistance to an officer's commands is relevant even if the officers were not attempting to arrest him." *Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016) (citing *Caie v. West Bloomfield Twp.,* 485 F. App'x 92, 96 (6th Cir. 2012)).  Again, the record is replete with unobeyed orders to leave.  This factor also weighs in favor of Officer Reinink.

In sum, balancing the use of force with the level of threat, the Court concludes from the totality of the circumstances that Officer Reinink's conduct did not violate the Fourth Amendment, and he is entitled to qualified immunity.  Under the tense and uncertain circumstances provoked by Hart's conduct, Officer Reinink made a split-second judgment to launch a munition toward Hart.  While Officer Reinink mistakenly launched the wrong munition, his split-second judgment was not objectively unreasonable.  Even when hindsight desires a different result and even when the conduct at issue violates an internal department policy, courts must apply the legal principles that govern claims of excessive force under the Fourth Amendment, including application of the doctrine of qualified immunity.  *See, e.g., Kelly*, 647 F. App'x at 577 (holding that the officer's actions did not violate the Fourth Amendment where the officer reasonably, but mistakenly, believed that the plaintiff was not restrained by his seatbelt during the incident).  Based on these principles as applied to the undisputed facts, the Court holds that Plaintiff Hart has not met his burden of demonstrating a constitutional violation.  Accordingly, Officer Reinink, like Officer Johnson and Sergeant Bush, is entitled to qualified immunity.

2.    **Count II:  Plaintiffs' § 1983 Claim against the City**

In Count II, which Plaintiffs title "Failure to Train, Inadequate Policies and/or Procedures, Illegal Custom and/or Practices—City," Plaintiff alleges that the City violated the "4th and/or 14th Amendments" by its—

> a.    Negligent training, policy and/or procedures resulting in the use of force under the circumstances of this case such that the police officers used force when no force was necessary, leading to deliberate indifference as to whether [Plaintiffs] Sean [Hart] and/or Tiffany [Guzman] would be injured;
>
> b.    Negligent and/or inadequate and/or failure to train defendant officers on the proper encountering of unarmed individuals, including [Plaintiffs] Sean [Hart] and/or Tiffany [Guzman]; [and]

34

       c.  Negligent supervision or failure to supervise the standards and certifications of defendant officers, and further, lack of proper discipline of said officers for this and all other incidents learned through the course of discovery.

(2d Am. Compl. ¶ 43).

In support of summary judgment in its favor, the City first argues that because Plaintiffs have failed to show an underlying constitutional violation by the individual Defendants, their *Monell* claim fails (ECF No. 111-1 at PageID.1367). The City further argues that Plaintiffs cannot show that the City's SRT training is constitutionally inadequate where the SRT officers were annually trained on the use of specialty munitions and use of force, as recently as one month before the riot (*id.*). Last, the City argues that Plaintiffs' "deliberate indifference" claims fail because there are no prior instances of unconstitutional conduct that would have put the City on notice that additional training was necessary (*id.* at PageID.1367–1368).

In response, relying only on *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), Plaintiffs argue that the "'slap on the wrist' punishment to defendant Reinink" and the fact that "every single officer in nearly 90 complaints for excessive force over a five-year span was exonerated or cleared by the department" are practices and procedures that "embolden" officers to use excessive force (ECF No. 119 at PageID.1481–1482). Plaintiffs argue that "[a] reasonable finder of fact could conclude that it was that climate or culture of ratification within the department that was the driving force behind the constitutional violations in the present case" (*id.* at PageID.1482).

A city is a "person" under § 1983 and so "can be held liable for constitutional injuries for which it is responsible." *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 616 (6th Cir. 2022) (citing *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978))). However, municipalities cannot be held liable "under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a

tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Rather, municipal liability under § 1983 depends on whether the plaintiff's constitutional rights have been violated as a result of "a 'policy' or 'custom' attributable" to the local government. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).

The Sixth Circuit has held that "the dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the plaintiff suffered no constitutional deprivation, nor, correspondingly, that a municipality (which, of course, is not entitled to qualified immunity) may not be liable for that deprivation." *Doe v. Sullivan Cnty., Tenn.*, 956 F.2d 545, 554 (6th Cir. 1992). *See also Winkler v. Madison Cnty.,* 893 F.3d 877, 899–901 (6th Cir. 2018) (explaining that a municipality may be held liable under § 1983 in certain cases where no individual liability is shown). Assuming, then, that Plaintiffs' *Monell* claim against the City remains viable following the dismissal of Count I, the Court determines that the City is nonetheless entitled to summary judgment on the claim.

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The plaintiff can look to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). Here, Plaintiffs do not identify any enactment or policy of the City in support of their claim. Neither do Plaintiffs pursue in briefing the inadequate training and supervision theory alleged in their pleading. Plaintiffs' briefing of Count II is limited to addressing only an alleged history or custom by the City of ratifying unconstitutional conduct, as exemplified by the City's alleged failure to

adequately discipline Officer Reinink and other GRPD officers over the years.  *See* Pls. Resp., ECF No. 119 at PageID.1481–1482.

The City's alleged failure to adequately discipline or seriously investigate Officer Reinink's conduct is not, on its own, enough to create municipal liability under a ratification theory.  "'A claim based on inadequate investigation' requires 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495-96 (6th Cir. 2020).  The case upon which Plaintiffs rely, *Marchese*, does not compel a different result.  In *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 453 (6th Cir. 2020), the Sixth Circuit rejected the plaintiff's argument that *Marchese* stood for the proposition that failure to investigate a single incident can be evidence of deliberate indifference.  The Sixth Circuit explained that the sheriff's deliberate indifference in *Marchese* was established by the failure to conduct an investigation after the district court ordered one.  *Id.* The Sixth Circuit reiterated that "a single instance of a failure to investigate, as alleged here, is insufficient to 'infer a policy of deliberate indifference.'" *Id.* (quoting *Thomas*, 398 F.3d at 433).  Hence, in *Meirs*, the Sixth Circuit rejected the plaintiff's ratification claim where there was "no evidence that [the county official's] ratification of inadequate cell checks was part of a persistent pattern." *Id.* at 452.

Additionally, as the City points out in reply, Plaintiffs cannot support their claim of municipal liability by "simply counting excessive force complaints and disagreeing with their outcomes without any qualitative analysis" (ECF No. 120 at PageID.1502–03, citing *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (holding that "nothing more than raw numbers, with no information surrounding the actual circumstances of the incidents" was insufficient to "show a consistent pattern of ignoring constitutional violations")).

37

In short, the Court concludes that Plaintiffs have not submitted evidence from which it is reasonable to infer liability on the part of the City for the alleged constitutional injuries in this case. Accordingly, the City is entitled to summary judgment of Plaintiffs' claim in Count II.

### C.    Plaintiffs' State-Law Claims

Having dismissed Counts I and II, the Court, in its discretion, declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims in Count III.  *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—(3) the district court has dismissed all claims over which it has original jurisdiction"); *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims...."). *See, e.g., Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Upon dismissing Brooks' federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks' remaining state-law claims.").

### III.    CONCLUSION

Therefore, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the motion for summary judgment filed by the City, Sergeant Bush, and Officer Johnson (ECF No. 111) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted as to Counts I and II, which are DISMISSED WITH PREJUDICE, and the motion is otherwise denied as to Count III, which is DISMISSED WITHOUT PREJUDICE.

**IT IS FURTHER ORDERED** that Defendant Reinink's motion for summary judgment (ECF No. 112) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted as to Count I, which is DISMISSED WITH PREJUDICE, and the motion is otherwise denied as

to Count III, which is DISMISSED WITHOUT PREJUDICE.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims in Count III.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case.  *See* FED. R. CIV. P. 58.

Dated:  March 31, 2023                                     /s/ Jane M. Beckering
                                                                   JANE M. BECKERING
                                                                   United States District Judge